UNITED STATES DISTRICT COURT
SOUTHERN DISTRICT OF FLORIDA

CASE NO. 26-mj-08406-RMM

UNITED STATES OF AMERICA

v.

SHON LASHARD GRIMSLEY,
CARLOS LORENZO LINDER,
LIOSBEL GUILLERMO FERRER ORTIZ, and
SAGON MICKALETOE STEWARD,

_____Defendants._____/

## CRIMINAL COVER SHEET

1. Did this matter originate from a matter pending in the Northern Region of the United States Attorney's Office prior to August 8, 2014 (Mag. Judge Shaniek Mills Maynard)?     NO

2. Did this matter originate from a matter pending in the Central Region of the United States Attorney's Office prior to October 3, 2019 (Mag. Judge Jared M. Strauss)?    NO

3. Did this matter involve the participation of or consultation with Magistrate Judge Eduardo I. Sanchez during his tenure at the U.S. Attorney's Office, which concluded on January 22, 2023?  NO

4. Did this matter involve the participation of or consultation with Magistrate Judge Marty Fulgueira Elfenbein during her tenure at the U.S. Attorney's Office, which concluded on March 5, 2024?   NO

Respectfully submitted,

JASON A. REDING QUIÑONES
UNITED STATES ATTORNEY

By:      *Justin Chapman*

Justin Chapman
Assistant United States Attorney
FL Bar No. 85778
United States Attorney's Office
500 S. Australian A venue #400
West Palm Beach, Florida 33401
(561) 209-1022
Justin.chapman4@usdoj.gov

AO 91 (Rev. 08/09)  Criminal Complaint

# UNITED STATES DISTRICT COURT
### for the
### Southern District of Florida

| | | |
|---|---|---|
| United States of America | ) | |
| v. | ) | |
| SHON LASHARD GRIMSLEY, | ) | Case No. 26-mj-08406-RMM |
| CARLOS LORENZO LINDER, | ) | |
| LIOSBEL GUILLERMO FERRER ORTIZ, and | ) | |
| SAGON MICKALETOE STEWARD, | ) | |
| | ) | |

*Defendant(s)*

**FILED BY** _____ *TM* _____ **D.C.**

**May 29, 2026**

ANGELA E. NOBLE
CLERK U.S. DIST. CT.
S. D. OF FLA. - WPB

## CRIMINAL COMPLAINT

I, the complainant in this case, state that the following is true to the best of my knowledge and belief.

On or about the date(s) of ___April 28, 2026 thru May 28, 2026___ in the county of _____Palm Beach_____ in the

___Southern___ District of _____Florida_____ , the defendant(s) violated:

| *Code Section* | *Offense Description* |
|---|---|
| Title 21 U.S.C. § 841(a)(1) | Distribution of fentanyl (by Shon Lashard Grimsley); |
| Title 21 U.S.C. § 841(a)(1), (b)(1)(A)(ii) and 846 | Conspiracy to possess with intent to distribute over 5 kilograms of cocaine (by all defendants); |
| Title 18 U.S.C. § 1951(a) | Attempt and conspiracy to commit Hobbs Act robbery (by all defendants); and |
| Title 18 U.S.C. § 924(c) and 2 | Possession of a firearm in furtherance of a drug trafficking crime (Aiding and Abetting) (by all defendants). |

This criminal complaint is based on these facts:

See Attached Affidavit

☑ Continued on the attached sheet.

_____
*Complainant's signature*

Special Agent Hugh Cunningham, ATF
*Printed name and title*

Sworn and Attested to me by Applicant by Telephone (FaceTime) pursuant to Fed. R. Crim. P. 4(d) and 4.1

Date: __5/29/26__

_____
*Judge's signature*

City and state: _____West Palm Beach, FL_____

Hon. Ryon M. McCabe, U.S. Magistrate Judge
*Printed name and title*

## AFFIDAVIT IN SUPPORT OF CRIMINAL COMPLAINT

I, Hugh Cunningham, being duly sworn, depose, and state the following:

## AGENT BACKGROUND AND INTRODUCTION

1.      I have been employed as a Special Agent (SA) with the Bureau of Alcohol, Tobacco, Firearms and Explosives (ATF) since December 2021. I am currently assigned to ATF Miami Field Division Group V – HIDTA South. My duties and responsibilities include the investigation of violations of federal laws related to the criminal misuse of firearms, firearms trafficking, violent crimes, including armed robberies, possession of firearms in furtherance of violent crimes, and drug trafficking offenses. I have completed a 12-week Criminal Investigator Training Program, and a 14-week ATF Special Agent Basic Training Academy taught at the Federal Law Enforcement Training Center located in Glynco, Georgia. Thus, I am a "federal law enforcement officer," as defined by Rule 41(a)(2)(C) of the Federal Rules of Criminal Procedure.

2.      I make this Affidavit for the limited purpose of establishing probable cause for a criminal complaint charging Shon Lashard GRIMSLEY committed distribution of fentanyl, in violation of Title 21, United States Code, Section 841(a)(1).  This Affidavit also establishes probable cause for the criminal complaint charging Shon Lashard GRIMSLEY, Carlos Lorenzo LINDER, Sagon Mickaletoe STEWARD, and Liosbel Guillermo Ferrer ORTIZ with: (1) conspiracy to possess with intent to distribute more than five kilograms of cocaine, in violation of Title 21, United States Code, Section 841(a)(1) and 846; (2) attempt and conspiracy to commit Hobbs Act robbery, in violation of Title 18, United States Code, Section 1951(a); and (3) possession of a firearm in furtherance of a drug trafficking crime, in violation of Title 18, United States Code, Section 924(c) and 2.



3.      The facts set forth in this Affidavit are based on my personal knowledge, review of records, documents, and other evidence obtained during this investigation, as well as information conveyed to me by other law enforcement officials and private persons. This Affidavit is submitted for the sole purpose of establishing probable cause and does not include every fact known to me about this matter.

## PROBABLE CAUSE

4.      In or around April of 2026, ATF Special Agents (SA) debriefed ATF Confidential Informant (CI) 9140 regarding an individual he/she knew that was selling narcotics. CI 9140 received the following phone number, ***-***-2060, for an individual with the nickname "Boogotti." CI 9140 stated that they contacted Boogotti and Boogotti told CI 9140 he could sell fentanyl capsules. Shortly thereafter, ATF agents met with local law enforcement Gang Detectives who stated "Boogotti" was the known street name for Shon GRIMSLEY, a documented Zoe Mafia Family (ZMF) gang member.  It should be noted, ZMF is a known criminal street gang operating in the South Florida area, specifically West Palm Beach, FL.  ZMF is known to commit acts of violence, traffic firearms, and operate as a drug trafficking organization (DTO).

5.      The CI has been utilized in proactive ATF investigations since November 2014, and information provided has been independently corroborated through local law enforcement databases, other confidential informants, controlled introductions / purchases of evidence by ATF Undercover (UC) Agents, as well as other investigative techniques. All information provided by CI 9140 has been deemed to be reliable and credible.

### April 28, 2026, Sale of Suspected Fentanyl

6.      On April 28, 2026, SA 6021 and CI 9140 arrived at the Downtown Food Store (717 N. Tamarind Ave., West Palm Beach, FL) to meet with GRIMSLEY for the purchase of narcotics. GRIMSLEY exited the store and entered the back seat of the undercover vehicle (UCV).

2

GRIMSLEY retrieved a clear plastic knotted baggie from his pocket, containing capsules of suspected fentanyl powder. GRIMSLEY stated, "I only had the small ones because I ran out of the big hats (larger fentanyl capsules)…they ten ($10.00)." SA 6021 asked GRIMSLEY, "How many you got." GRIMSLEY told SA 6021 he had twelve (12) to sell them. SA 6021 agreed to purchase ten (10) capsules from GRIMSLEY. GRIMSLEY placed the baggie of suspected fentanyl capsules on the center console of the UCV. SA 6021 inspected the baggie and confirmed that it contained twelve (12) capsules. GRIMSLEY told SA 6021 he was willing to accept $100.00 for the twelve (12) capsules. SA 6021 handed GRIMSLEY $100.00 in ATF funds for the suspected fentanyl. GRIMSLEY told SA 6021, "You gona hit me every time…that's that purple magic…they love it." GRIMSLEY agreed to conduct future transactions with SA 6021. GRIMSLEY further stated "If I ain't got it…one of my youngins got it." GRIMSLEY then exited the UCV.  The narcotics presumptively tested positive for fentanyl.

## May 1, 2026, Sale of Suspected Fentanyl

7.       On May 1, 2026, SA 6021 and SA 5342 arrived at 885 7th Street, West Palm Beach, (FL) to meet with GRIMSLEY for the purchase of narcotics.  GRIMSLEY approached the UCV and entered into the back seat. GRIMSLEY retrieved a clear plastic knotted baggie from his pocket, containing capsules of suspected fentanyl powder and handed it to SA 6021. The amount in the baggie did not reflect the agreed upon amount of fifty (50) fentanyl capsules, SA 6021 asked GRIMSLEY if he had the rest. GRIMSLEY told SA 6021, "I got it all in there (885 7th St., West Palm Beach, FL)…need to get some more hats…I'm finna scoop some more." GRIMSLEY exited the UCV, crossed the street, and entered the front door of 885 7th St., West Palm Beach, FL. GRIMSLEY exited the residence, returned to the UCV, and entered the back seat. He then retrieved a clear plastic knotted baggie from his pocket, containing capsules of suspected fentanyl powder

3

and handed it to SA 6021. SA 6021 handed the capsules to SA 5342 to inspect. SA 6021 handed GRIMSLEY $620.00 in ATF funds.

8.       SA 6021 explained to GRIMSLEY that they were from Chicago, IL and were planning on taking the capsules and distributing them there. GRIMSLEY stated "I can get whatever…zips (ounces) whatever." SA 6021 asked what the "Zips" would be like. GRIMSLEY stated "It'll be more rocky…the best shit you want is rock." SA 6021 explained to GRIMSLEY that the fifty (50) capsules were a sample amount and would be wanting to purchase a larger quantity. GRIMSLEY told SAs "You wanna go an ounce…buy one ounce of it pure…you cut it with something fake…I send you to a spot where they got the cut at…you put an ounce on an ounce…this how strong this shit is because one ounce in to two ounce…that's where you make your money."

9.       GRIMSLEY told SAs, "One ounce go for two bands ($2,000.00)….but you turn one ounce into two bands…if you break it down to hats (capsules) you gona make five or six bands." GRIMSLEY explained to SAs, "You cannot give it to no one…do not give it to no one pure…meaning if you get the ounce, don't put that in a cap (capsule) and go sell it to somebody…you gona kill'em…you gona kill'em." GRIMSLEY told SA 6021, " Trump busts you…this aint no game…just a cap will fuck you over…this the shit that Trump don't want in the fucking U.S." GRIMSLEY exited the UCV and returned to the 885 7th St. residence. The narcotics presumptively tested positive for fentanyl.

## May 5, 2026, Sale of Suspected Fentanyl

10.       On May 5, 2026, SA 6021 and SA 5342 arrived at 885 7th Street, West Palm Beach, (FL) to meet with GRIMSLEY for the purchase of narcotics. GRIMSLEY approached the UCV and entered the back seat. GRIMSLEY told the SAs, "Put 14 on it…white…purple…whatever…it's gonna stretch how I said…usually put a whole thang…last time I put a whole thang it weakened up." Then, GRIMSLEY further stated, "Don't put under…you'll

4

drop (kill/overdose) a bitch." GRIMSLEY retrieved a clear plastic knotted baggie from his pocket, containing suspected fentanyl powder, and handed it to SA 6021. SA 6021 handed the narcotics to SA 5342 to weigh. SA 5342 confirmed the agreed upon amount of approximately 28 grams. SA 6021 handed GRIMSLEY $2,000.00 in ATF funds.

11.     GRIMSLEY told SAs, "If you don't cut it up…that shit will kill somebody." GRIMSLEY further stated, "A bitch died at the store…I'm not saying it was us…it was about three weeks ago…you gotta know how to cut that shit." GRIMSLEY stated, "If a bitch die…guess what…they (law enforcement) can pick up the phone and connect that you hollered at that person…that's second-degree manslaughter." GRIMSLEY further stated, "Trump is from Palm Beach County…he don't play with THAT drug (fentanyl)…he don't play with it." SAs asked GRIMSLEY if he had firearms for sale. GRIMSLEY stated, "I don't sell fire (firearms)…I collect'em." GRIMSLEY exited the UCV and returned to the 885 7th St. residence.

12.     It should be noted, the suspected fentanyl powder was tested and rendered inconclusive results.

## May 9, 2026, Recorded Phone Call

13.     On or about May 9, 2026, ATF SA Adrian Halley reviewed a telephone call between CI 9140 and GRIMSLEY. During the recorded telephone conversation, GRIMSLEY and CI 9140 discussed the previous narcotics transaction between GRIMSLEY and ATF UC SAs. GRIMSLEY acknowledged that he had sold the ATF UCs fictitious narcotics because he was suspicious that the ATF UCs were law enforcement. GRIMSLEY then explained that he had consulted with a previously identified subject of investigation 25-20622 as to the trustworthiness of CI 9140 and the ATF UCs, and whether they were members of law enforcement. GRIMSLEY indicated that he was assured that CI 9140 and the ATF UCs were not members of law enforcement. It was at that point

that GRIMSLEY agreed to continue to conduct further narcotics transactions with CI 9140 and his/her associates (ATF UCs). GRIMSLEY informed CI 9140 that he was going to reimburse the ATF UCs and correct the fictious narcotics transactions and sell narcotics to the ATF UCs on a later date. GRIMSLEY stated that drug dealing is "what I do" and that he has "official shit" on him to sell. GRIMSLEY told CI 9140 he was a "big dog in the city" and was the "head of ZMF." GRIMSLEY continued by stating he was the "head of all the Zoes in Palm Beach."

14.     Furthermore, during the conversation, CI 9140 told GRIMSLEY he/she didn't believe GRIMSLEY was trying to rob or conduct poor business with them. GRIMSLEY stated that he wouldn't conduct poor business for $2000.00 and indicated that he made the decision to provide ATF UCs with counterfeit narcotics because he suspected they were police. Additionally, GRIMSLEY stated he wouldn't "go to war" (cause a fight between him and ATF UCs for providing them with fake narcotics) over $2000.00.

15.     GRIMSELY stated "I'm thinking police wise, if this was street wise, what the fuck is $2000.00?". Moreover, GRIMSLEY stated "that's what my team on" when the conversation delved into other criminal activity, specifically robbery. GRIMSLEY stated "fuck a group, I got a city, a whole fucking city of niggas on whatever."

### May 11, 2026, Sale of Suspected Fentanyl

16.     On May 11, 2026, SA 6021 and SA 5342, accompanied by CI 9140, arrived at BJ's Restaurant (1807 Palm Beach Lakes Blvd, West Palm Beach, FL) to meet with GRIMSLEY for the purchase of narcotics.  GRIMSLEY greeted SAs and CI and told SA 6021, "You can smell it and everythang…you gonna kill'em" before he handed SA 6021 a clear plastic knotted baggie from his pocket, containing suspected fentanyl powder. SA 6021 asked GRIMSLEY, "No bullshit?" to which GRIMSLEY replied, "No bullshit whatsoever." GRIMSLEY retrieved an additional baggie

6

of suspected fentanyl powder for SAs to inspect. SA 6021 handed the narcotics to SA 5342 to secure and handed GRIMSLEY $1,700.00 in ATF funds. GRIMSLEY counted the money and told SA 6021, "You all the way straight…I'm more than sure you gonna love that." GRIMSLEY exited the UCV and returned to BJ's Restaurant. The narcotics presumptively tested positive for fentanyl.

### May 14, 2026, Sale of Suspected Fentanyl and Undercover Meeting

17.     On May 14, 2026, SA 6021 arrived at BJ's Restaurant (1807 Palm Beach Lakes Blvd, West Palm Beach, FL) to meet with GRIMSLEY for the purchase of narcotics. SA 6021 placed a call to GRIMSLEY to advise him that they had arrived. SA 6021 observed GRIMSLEY seated in a white Jeep SUV in the BJ's Restaurant parking lot. GRIMSLEY directed SA 6021 to conduct the transaction in his vehicle. SA 6021 exited the UCV, approached GRIMSLEY's vehicle, and entered the front passenger seat of GRIMSLEY's vehicle.  Once in the vehicle, GRIMSLEY handed a plastic knotted baggie of suspected fentanyl powder to SA 6021. SA 6021 weighed the narcotics which appeared to be the agreed amount of approximately two (2) ounces. SA 6021 handed GRIMSLEY $3,400.00 in ATF funds.

18.     After the transaction, SA 6021 asked GRIMSLEY if he had associates as he previously stated to CI 9140. GRIMSLEY told SA 6021, "I got a whole city…I'm a big dog of a whole city of niggas." SA 6021 acknowledged and explained to GRIMSLEY that they had an associate who picked up three (3) to five (5) "Bricks" (kilos of cocaine) from a drug stash house once a month but has not been paid the last couple of times and is owed $5,000.00. SA 6021 further explained, "When I say he's grabbing bricks, I'm talking 100% pure Colombian cocaine." SA 6021 informed GRIMSLEY that the stash house was protected by two (2) individuals and told GRIMSLEY, "They're machete…chop your head off type motherfuckers." SA 6021 told GRIMSLEY that their associate was looking for individuals willing to participate in robbing the

7

drug stash house for kilos of cocaine. SA 6021 further explained that they and their associate were unable to commit the robbery themselves because the organization (Mexican Cartel) and armed guards know them personally and would be too dangerous for them and their families.

19.     SA 6021 told GRIMSLEY they didn't want to discuss the robbery with GRIMSLEY if "It wasn't something you're about." GRIMSLEY told SA 6021, "I'm about everything...I'm about that...I got two youngins (associates) right now...heavy artillery (firearms)...shit like that...licks like that...it can go smooth playing with drugs...they ain't calling the police...can't call that someone stole your drugs...if he want to play it like we robbing him." SA 6021 further explained to GRIMSLEY that the stash house was guarded by two (2) armed individuals, and their associate has seen one individual with a pistol in their waistband and the other with an additional rifle on the coffee table inside. Additionally, SA 6021 told GRIMSLEY that according to their associate, there were at least fifteen (15) to twenty (20) "Bricks" in the residence.

20.     SA 6021 asked GRIMSLEY if he was willing to meet with their associate to discuss the proposed robbery since they received the details regarding the stash house directly. GRIMSLEY told SA 6021, "You can definitely put me with him...we can make this a soon as possible thang...my youngins are on go (ready)...I tell them about this...they see money...let's do it." SA 6021 acknowledged and told GRIMSLEY that they would speak with their associate to arrange a future meeting. SA 6021 told GRIMSLEY that they would continue to conduct future transactions and stated, "I'll keep fucking with you on this (fentanyl powder)...but that (robbery) is the real play." GRIMSLEY acknowledged and stated, "That's the real play." SA 6021 exited GRIMSLEY's vehicle, returned to the UCV. It should be noted, the narcotics presumptively tested positive for fentanyl.

8



### May 19, 2026, Undercover Meeting

21.     On May 19, 2026, ATF UC SA 5073 traveled to the BJ's restaurant located at 1807 Palm Beach Lakes Boulevard, West Palm Beach, FL to meet with GRIMSLEY. The purpose of the meeting was to discuss the proposed robbery of kilogram quantities of cocaine from a drug stash location operated by members of a Mexican based Drug Trafficking Organization (DTO). SA 5073 arrived at the BJ's restaurant as directed by SA 6021 and observed SA 6021 and GRIMSLEY sitting in SA 6021's vehicle. SA 5073 parked next to SA 6021's vehicle, at which time SA 6021 and GRIMSLEY entered SA 5073's vehicle. GRIMSLEY entered the front passenger's seat of SA 5073's vehicle and SA 6021 entered the rear of the SA 5073's vehicle.

22.     Once introductions were made, SA 5073 stated he/she heard GRIMSLEY would be able to help SA 5073 with the "little situation." GRIMSLEY responded by saying, "Damn right." SA 5073 then introduced himself/herself to GRIMSLEY as a disgruntled drug courier for a Mexican based DTO. SA 5073 explained he/she was responsible for transporting kilogram quantities of cocaine on behalf of the DTO and while collecting the cocaine at the stash houses operated by the DTO, SA 5073 observed at least fifteen (15) kilograms of cocaine. GRIMSLEY asked how many members of the DTO were present inside the drug stash locations. SA 5073 explained the stash houses were occupied by two (2) members of the DTO, both of which were armed with firearms.

23.     GRIMSLEY interrupted and stated he wasn't worried about the members of the DTO being armed, as long as the robbery crew had the element of surprise. Specifically, GRIMSLEY stated, "Long as we get the ups I ain't worried about it, I just gotta get the ups." In response, SA 5073 stated, "Say what?" GRIMSLEY clarified and stated, "Meaning I draw first. I pull on you first...I ain't worried about your gun." SA 5073 cautioned GRIMSLEY that the members of the DTO were dangerous and should not be taken lightly. Specifically, SA 5073 stated,

9

"Yeah cause these motherfuckers ain't gonna lay down you know what I'm sayin. Like these are some dangerous motherfuckers so they're gonna pop back." GRIMSLEY responded by saying, "They gonna die."

24.     As the conversation progressed, SA 5073 again explained he/she observed "no less" than "fifteen bricks" of cocaine inside the drug stash locations. SA 5073 and GRIMSLEY then discussed the split of the proceeds. Specifically, SA 5073 and GRIMSLEY agreed to split the cocaine obtained during the robbery evenly. SA 5073 asked whether GRIMSLEY thought the robbery was something he could "pull off." GRIMSLEY responded in the affirmative and stated, "Yeah it's something I can pull off but it's gonna be a team." GRIMSLEY went on to say the robbery crew would consist of three (3) individuals, GRIMSLEY and two (2) of his "Youngins." SA 5073 cautioned GRIMSLEY there could be no juveniles involved in the robbery. In response, GRIMSLEY stated, "Nah, no pups. Ah, ah, my, my, youngins…what I mean is like certified. Like you talkin to somebody, ah, ah, ah, that's powerful over all the Haitians in in Palm Beach County, you feel what I'm sayin? Top dog of all the Haitians in Palm Beach County. So when I mean one of my youngins, I mean top troops. You feel what I'm sayin? There not gonna play, they're gonna shoot first ask questions later." SA 5073 acknowledged.

25.     GRIMSLEY instructed SA 5073 to stay calm during the robbery and trust that GRIMSLEY and his associates would conduct the robbery as planned. GRIMSLEY again referenced gaining the element of surprise, conducting the robbery, and then restraining the members of the DTO present inside the stash house before killing them and stealing the cocaine. SA 5073 went on to describe the cocaine as being of good quality. Specifically, SA 5073 stated, "This is that pure coke, you know what I'm sayin. Like this is some Colombian shit they bring it up through Mexico." GRIMSLEY interrupted and stated, "This is the shit that they turning one into

10

two." SA 5073 agreed. SA 5073 then questioned GRIMSLEY as to whether he would be able to sell the cocaine once obtained during the robbery. GRIMSLEY stated he would have no problem selling the cocaine once obtained during the robbery. GRIMSLEY even joked he would be able to re-sell the cocaine at a cheap price, due to the fact that he and his associates obtained the cocaine "for free."

26.     After more general conversation regarding the proposed robbery, SA 5073 and GRIMSLEY agreed to meet on the following date to further discuss and plan the details of the robbery. Shortly thereafter, the meeting concluded and GRIMSLEY and SA 6021 exited SA 5073's UC vehicle. It was at that point that SA 5073 departed the area.

## May 21, 2026, Undercover Meeting

27.     On May 21, 2026, ATF UC SAs 5073 and 6021 traveled to the BJ's restaurant located at 1807 Palm Beach Lakes Boulevard, West Palm Beach, FL to meet with GRIMSLEY and the members of the robbery crew. The purpose of the meeting was to further discuss the proposed robbery of kilogram quantities of cocaine from a drug stash location operated by members of a Mexican based DTO.

28.     Upon arrival of the UCs to the aforementioned location, a short time later, GRIMSLEY arrived in a white 2024 Jeep Compass bearing Georgia (GA) registration CYV9140. An NLETS query shows the vehicle registered to EAN Holdings LLC of 5925 Parkway North Boulevard, Cumming, GA. GRIMSLEY parked the Jeep next to the UC vehicle at which time GRIMSLEY and his associate, later identified as Carlos Lorenzo LINDER Jr., exited the Jeep and entered the UC vehicle. GRIMSLEY was seated in the rear passenger's seat, and LINDER was seated in the rear driver's seat of the UC vehicle. Once inside the UC vehicle, GRIMSLEY stated, "My other little partner, we left him out but we the brains anyway." SA 5073 then questioned

11



GRIMSLEY as to whether he had discussed the details of the robbery with LINDER.  GRIMSLEY responded in the negative and stated he wanted LINDER to hear the details of the robbery directly from SA 5073.

29.     SA 5073 then introduced himself to LINDER as a disgruntled drug courier for a Mexican based DTO. SA 5073 explained he was responsible for transporting kilogram quantities of cocaine on behalf of the DTO and while collecting the cocaine at the stash houses operated by the DTO, SA 5073 observed at least fifteen (15) kilograms of cocaine. SA 5073 then stated, basically I'm just looking for, you know, a team…basically some jack boys that can run up there and take what they got." SA 5073 cautioned LINDER that the members of the DTO present inside the drug stash location were "cartel dudes" and "fucking dangerous." SA 5073 explained the stash houses were occupied by two (2) members of the DTO, both of which were armed with firearms

30.     SA 5073 questioned GRIMSLEY and LINDER about how the robbery would be committed.  GRIMSLEY stated he and his associates wanted to "map it out" and asked about the layout of the drug stash houses utilized by the DTO. SA 5073 described the drug stash location utilized by the DTO and added that the stash locations were vacant and contained only the cocaine. When asked how they intended to commit the robbery, GRIMSLEY stated he thought the best way to commit the robbery was to enter the drug stash location shortly after SA 5073 enters the residence. Specifically, GRIMSLEY stated, "That's just gonna be the easiest way to get in there…we gotta ambush you. You get what I'm sayin. Like we gotta bllpppppp. Once you get the door open we be comin behind you." It should be noted that as GRIMSLEY referenced crashing through the front entry door to the drug stash location behind SA 5073, GRIMSLEY motioned his body as though he was crashing through the door. GRIMSLEY added that entering the drug stash location behind SA 5073 would also give the robbery crew the advantage of the element of surprise.

12

31.     LINDER interrupted and stated he agreed with what GRIMSLEY was saying and further stated he already had the robbery planned out in his head. LINDER suggested SA 5073 hold the door open upon entry to the residence until the robbery crew entered behind SA 5073. LINDER then stated, "We comin in that bitch man." SA 5073 went on to question GRIMSLEY about whether he had spoken with LINDER about the split of the proceeds.  GRIMSLEY responded by saying, "Yeah I talked to him about the split, told him we was gonna get one extra." SA 5073 acknowledged and guaranteed there would be "no less" than "fifteen bricks of coke" inside the drug stash location during the robbery.  GRIMSLEY and LINDER agreed to split the proceeds evenly. SA 5073 then asked LINDER, "You straight wit that?" LINDER responded affirmatively. LINDER went on to say, "I ain't gonna lie, what we comin with, like I, I know for a fact like they ain't gonna have no chance." SA 5073 reminded GRIMSLEY and LINDER the members of the DTO inside the drug stash location were armed, LINDER interrupted and stated, "I'm tellin you that, what we comin wit, they ain't, they ain't got no chance." GRIMSLEY then added, "They don't expect it cause they, their not used to getting hit. So that's what gives us the ups right there. Their guard gonna be down, they're gonna be comfortable."

32.     As the conversation progressed, SA 6021 discussed the sale of the cocaine after it was obtained during the robbery and the fact that the cocaine could not be sold in its original packaging. GRIMSLEY agreed and stated, "You gotta re-rock them and get them straight." GRIMSLEY went on to say, "It's stamped. Ah, re-rock it and rock it back up. Take that stamp up outta there." LINDER then asked how the UCs felt about the plan. SA 5073 stated he was "cool" with the plan as long as GRIMSLEY and LINDER were "cool" with the plan. LINDER then asked if SA 5073 was concerned the members of the DTO would find out SA 5073 was involved in the robbery. SA 5073 responded in the affirmative. SA 5073 assured GRIMSLEY and LINDER the

13

cocaine was of good quality. Specifically, SA 5073 stated, "This is that pure coke, you know what I'm sayin. Like they're bringing that shit up from Mexico." GRIMSLEY and LINDER acknowledged. SA 5073 then asked, "But I mean you good with the plan, like you, you feel comfortable wit it." Both GRIMSLEY and LINDER responded affirmatively. SA 5073 confirmed there would be three (3) individuals conducting the robbery, GRIMSLEY, LINDER, and one (1) additional associate). GRIMSLEY responded by saying, "Yeah." GRIMSLEY and LINDER identified the third individual that would be assisting with the robbery as LINDER's cousin.

33. After more general conversation regarding the proposed robbery, GRIMSLEY referenced the fact that there were additional couriers coming to the drug stash location who may have US currency on their person. SA 5073 interrupted and clarified that no one was coming to the drug stash locations with money, all payments were handled separately. SA 5073 then stated, "Na, there aint no cash. Zero cash." SA 5073 went on to say, "Like I told you, there's no money in the house. There's no nuttin. The only thing in the mother fuckin house is the cocaine. That is it, period."

34. As the meeting concluded, SA 5073 asked if GRIMSLEY and LINDER had any additional questions about the drug stash locations. GRIMSLEY stated, "Just keep us posted." LINDER stated, "I ain't worried bout nuttin cause I know what we capable of and I know how we comin so all I'm worried about is the way that house set up." Shortly thereafter, the meeting concluded and GRIMSLEY and SA 6021 exited SA 5073's UC vehicle. It was at that point that SA 5073 departed the area.

### May 26, 2026, Undercover Meeting

35. On May 26, 2026, ATF UC SAs 5073 and 6021 traveled to the BJ's restaurant located at 1807 Palm Beach Lakes Boulevard, West Palm Beach, FL to meet with GRIMSLEY.

14



The purpose of the meeting was to further discuss the proposed robbery of kilogram quantities of cocaine from a drug stash location operated by members of a Mexican based DTO.

36.     Upon arrival of the UCs to the aforementioned location, a short time later, GRIMSLEY arrived in a grey 2025 Toyota Corolla bearing Louisiana (LA) registration N678320 operated by a black female believed to be the girlfriend of GRIMSLEY. An NLETS query shows the vehicle registered to EAN Holdings LLC of 1610 US 17 Business, Surfside Beach, South Carolina (SC). GRIMSLEY exited the Toyota and entered the rear passenger's seat of the UC vehicle.

37.     Once inside the UC vehicle, SA 5073 informed GRIMSLEY that he/she (SA 5073) had received a telephone call from the members of the DTO, and SA 5073 was scheduled to pick up the kilograms of cocaine from the drug stash location later in the week. GRIMSLEY responded by saying, "I'm set up to, to be on standby...me and my two guys." SA 5073 asked whether GRIMSLEY had spoken to all the members of the robbery crew. GRIMSLEY responded by saying, "Yeah, yeah, they good." SA 5073 then questioned GRIMSLEY as to whether the members of the robbery crew were "cool" with the plan. In response, GRIMSLEY stated, "Ev, everybody cool with it." SA 5073 and GRIMSLEY went on to discuss the layout of the drug stash locations utilized by the members of the DTO. SA 5073 went on to ask GRIMSLEY, "No matter what we're doing it?" GRIMSLEY responded by saying, "Yeah we doin it...we, we doin it. You feel what I'm sayin? Like, this, these are life changing opportunities."

38.     As the conversation progressed, UC-6021 asked whether GRIMSLEY and the members of the robbery crew would be able to secure vehicles for use during the robbery. GRIMSLEY advised he and his associates planned to utilize rental vehicles for use during the robbery and added that he and his associates had already secured one (1) rental vehicle.

15

GRIMSLEY discussed the fact that the robbery crew needed to use caution when utilizing the rental vehicles as law enforcement had the ability to track the movement of rental vehicles. Specifically, GRIMSLEY stated, "Anything go wrong, all rentals have trackers. You get what I'm sayin? Ya'll can track that this rental been here at this time. Now ya'll pressin the people that owned the rental who was in the rental at the time of the crime." SA 5073 then again asked, "Your new people, he's good wit it? He's good with the split, he's good wit everything?" In response GRIMSLEY stated, "Yeah everything's good bro. You get what I'm sayin. Cause if it's the pure, we can turn it one into two and, and, and, and, and, still come out great. You know what I'm sayin? But whatever number we is, we definitely gotta get that stamp of it too." The UCs agreed. GRIMSLEY joked that after the cocaine was obtained during the robbery, the kilograms would be re-packaged for sale with a "Z" stamped on the kilograms.

39.     GRIMSLEY also discussed he and the members of the robbery crew hiding in SA 5073's vehicle as he/she arrived to the drug stash location and exiting the vehicle behind SA 5073 to conduct the robbery. GRIMSLEY cautioned SA 5073 that if he and the members of the robbery crew hid inside SA 5073's vehicle, they (robbery crew) would have to be "discrete." Specifically, GRIMSLEY stated, "Things gotta be just discrete as fuck…just discrete as fuck. Ain't no patrol bein called at the aftermath because it's a brick house. Ain't no fuckin police being called. Bitch just gonna die in that bitch and that's just what it is. They gonna fight for their shit, they gonna die and, and, we gonna come up outta there a hundred thousand dollars richer. You feel what I'm sayin? After more general conversation regarding the robbery, the meeting concluded. The UCs departed the area shortly thereafter. GRIMSLEY exited the UC vehicle and walked towards the BJ's restaurant.

16

## May 28, 2026, Undercover Meeting

40. On May 28, 2026, ATF UC SAs 5073 and 6021 traveled to a business facility located in West Palm Beach, FL to meet with GRIMSLEY and his associates. The purpose of the meeting was to further discuss the proposed robbery of kilogram quantities of cocaine from a drug stash location operated by members of a Mexican based DTO and ultimately execute the robbery of the stash location.

41. A short time after the UCs arrived, GRIMSLEY arrived in a grey 2025 Toyota Corolla bearing Louisiana (LA) registration N678320. It should be noted that this is the same vehicle GRIMSLEY arrived in to meet UCs on May 26, 2026. SA 5073 exited the UCV and approached the grey Toyota Corolla. SA 5073 engaged GRIMSLEY in conversation and asked, "We straight?" GRIMSLEY responded by saying, "Yup." SA 5073 then asked, "You got the team?" In response, GRIMSLEY stated, "You know it." SA 5073 then explained he wanted to discuss the proposed robbery with the other members of the robbery crew. GRIMSLEY agreed, SA 5073 walked over to the Toyota Corolla and entered the front passenger's seat of the vehicle and engaged in conversation with the members of the robbery crew. Once introductions were made, SA 5073 asked whether GRIMSLEY had previously discussed the proposed robbery with LINDER, ORTIZ, and STEWARD. STEWARD responded in the negative. SA 5073 then yelled to GRIMSLEY and asked whether he had discussed the proposed robbery with the robbery crew. GRIMSLEY responded by saying, "Yeah I filled him in but...you, it different hearing it from your voice."

42. SA 5073 explained the details of the robbery, at which time STEWARD interrupted and asked whether SA 5073 was a member of law enforcement. SA 5073 responded in the negative. SA 5073 went on to say, "When we get to this house, these mother fuckers ain't playin. You know what I'm sayin? These are some real cartel dudes." SA 5073 further explained there were two (2)

17

members of the DTO present inside the drug stash location, one (1) of which was armed with a firearm. SA 5073 stated there would be "no less than fifteen keys of coke in that mother fuckin house." SA 5073 informed the robbery crew that GRIMSLEY had previously stated the robbery intended to allow SA 5073 to enter the drug stash location and then "push in" the residence behind SA 5073. SA 5073 asked if that was still the plan. LINDER and ORTIZ both responded affirmatively. SA 5073 then asked, "You got the, you got the pistols and all that cause he said you guys are comin with the artillery. You guys got everything you need?" ORTIZ motioned with his hand towards his waistband and responded affirmatively." STEWARD stated, "Yo, as long as you ain't the police you alright." SA 5073 again assured STEWARD that he/she (SA 5073) was not a member of law enforcement. SA 5073 explained there needed to be trust as SA 5073 was trusting the robbery crew with his/her (SA 5073) life. SA 5073 explained if the members of the DTO learned SA 5073 was involved with conducting the robbery, SA 5073 would be killed. SA 5073 motioned towards GRIMSLEY who was standing outside the Toyota and stated, "I told him from jump right, I need some jack boys to take them mother fuckers for everything they got and that's what were here doing, you know what I'm sayin."

43.     After more general conversation regarding the robbery, SA 5073 advised STEWARD, ORTIZ, LINDER, and GRIMSLEY to follow them to a nearby ATF controlled location where a rental car would be waiting. It should be noted, GRIMSLEY requested the UCs provide a rental car to be utilized during the commission of the robbery. SA 5073 exited the Toyota Corolla and entered the UCV accompanied by UC 6021.

44.     The UCV, followed by the Toyota Corolla, departed the business facility and traveled to the ATF controlled location. Upon arrival at the ATF controlled location, the UCs exited the UCV. SA 5073 approached the Toyota Corolla and engaged in conversation with GRIMSLEY.

18



SA 5073 asked GRIMSLEY who would be entering the house with SA 5073, to which GRIMSLEY responded, "them two for sure", while pointing at ORTIZ and STEWARD. GRIMSLEY advised SA 5073 that ORTIZ and STEWARD would be entering the house with SA 5073 while GRIMSLEY and LINDER waited in the car for back-up. SA 5073, reiterated to GRIMSLEY that, "remember soon as we get that call…boom we're right out from here."

45.     SA 5073 walked away from the Toyota Corolla and approached SA 6021 and ORTIZ. SA 5073 asked GRIMSLEY to get out of the car to discuss the plan one more time to ensure everyone was on the same page regarding the robbery. SA 5073 and GRIMSLEY then began discussing how the narcotics would be split following the robbery to which GRIMSLEY responded, "I'm dealing with my people, you deal with yours."

46.     After more general conversation regarding the robbery, SA 5073 walked over to the Toyota Corolla, occupied by LINDER, ORTIZ, and STEWARD, and began discussing repackaging the narcotics following the robbery. LINDER stated, "we straight once we get up outta there. We ain't gotta worry bout nothin after that." Shortly after, SA 5073 and SA 6021 began walking away from the location and GRIMSLEY, LINDER, ORTIZ, and STEWARD were taken into custody by law enforcement.

47.     Following the arrest of GRIMSLEY, LINDER, ORTIZ, and STEWARD a search of the Toyota Corolla was conducted by ATF personnel. The search of the vehicle resulted in the recovery of two firearms described below:

   a. (1) One Grand Power S.R.O. Model STRIBOG SP9A1 9mm pistol bearing serial number GSA18570 loaded with 17 rounds of 9mm ammunition including one round loaded in the chamber

19

b.  (1) One Glock Inc Model 45 9mm pistol bearing serial number bpee912 loaded with 9 rounds of ammunition including one round loaded in the chamber.

### CONCLUSION

48.  I respectfully submit that there is probable cause to believe that Shon Lashard GRIMSLEY distributed fentanyl, in violation of Title 21, United States Code, Section 841(a)(1).

49.  I respectfully submit that there is probable cause to believe that Shon Lashard GRIMSLEY, Carlos Lorenzo LINDER, Sagon Mickaletoe STEWARD, and Liosbel Guillermo Ferrer ORTIZ committed the following federal offenses: (1) conspiracy to possess and distribute a controlled substance (cocaine), in violation of Title 21, United States Code, Section 841(a)(1) and 846; (2) attempt and conspire to commit Hobbs Act robbery, in violation of Title 18, United States Code, Section 1951(a); and (3) possession of a firearm in furtherance of a drug trafficking crime, in violation of Title 18, United States Code, Section 924(c) and 2.

FURTHER YOUR AFFIANT SAYETH NAUGHT.

Hugh Cunningham IV, Special Agent
Bureau of Alcohol, Tobacco, Firearms and
Explosives (ATF)

Attested to by the applicant in accordance with the requirements of Fed. R. Crim. P. 4.1 by FaceTime, on this 29 day of May 2026, at West Palm Beach, Florida

HON. RYON M. McCABE
UNITED STATES MAGISTRATE JUDGE

20



**UNITED STATES DISTRICT COURT
SOUTHERN DISTRICT OF FLORIDA**

PENALTY SHEET

**Defendant's Name**: Shon Lashard Grimsley

**Case No**:

Count #: 1

Distribution of a controlled substance (fentanyl)

Title 21, United States Code, Section 841(a)(1)
* **Max. Term of Imprisonment: 20 years**
* **Mandatory Min. Term of Imprisonment (if applicable): N/A**
* **Max. Supervised Release: 3 years**
* **Max. Fine: $1,000,000**
* **Special Assessment: $100 upon conviction**

Count #: 2

Conspiracy to possess with intent to distribute over 5 kilograms of cocaine, in violation of Title 21, United States Code, Section 841(a)(1), (b)(1)(A)(ii) and 846

Title 21, United States Code, Section 841(a)(1) and 846
* **Max. Term of Imprisonment: Life**
* **Mandatory Min. Term of Imprisonment (if applicable): 10 years**
* **Max. Supervised Release: Life**
* **Max. Fine: $10,000,000**
* **Special Assessment: $100 upon conviction**

Count #: 3

Attempt and conspire to commit Hobbs Act robbery, in violation of Title 18, United States Code, Section 1951(a)

Title 18, United States Code, Section 951(a)
* **Max. Term of Imprisonment: 20 years**
* **Mandatory Min. Term of Imprisonment (if applicable): n/a**
* **Max. Supervised Release: 3 years**
* **Max. Fine: $250,000**
* **Special Assessment: $100 upon conviction**

**\*Refers only to possible term of incarceration, supervised release and fines.   It does not include restitution, special assessments, parole terms, or forfeitures that may be applicable.**



Count #: 4

<u>Possession of a firearm in furtherance of a drug trafficking crime (Aiding and Abetting)</u>

<u>Title 18, United States Code, Section 924(c) and 2</u>
* **Max. Term of Imprisonment: Life**
* **Mandatory Min. Term of Imprisonment (if applicable): 5 years**
* **Max. Supervised Release: 5 years**
* **Max. Fine: up to $250,000**
* **Special Assessment: $100 upon conviction**

**\*Refers only to possible term of incarceration, supervised release and fines. It does not include restitution, special assessments, parole terms, or forfeitures that may be applicable.**

**UNITED STATES DISTRICT COURT
SOUTHERN DISTRICT OF FLORIDA**

PENALTY SHEET

**Defendant's Name**: CARLOS LORENZO LINDER

**Case No**: _____

Count #: 2

Conspiracy to possess with intent to distribute over 5 kilograms of cocaine, in violation of Title 21, United States Code, Section 841(a)(1), (b)(1)(A)(ii) and 846

Title 21, United States Code, Section 841(a)(1) and 846
* **Max. Term of Imprisonment: Life**
* **Mandatory Min. Term of Imprisonment (if applicable): 10 years**
* **Max. Supervised Release: Life**
* **Max. Fine: $10,000,000**
* **Special Assessment: $100 upon conviction**

Count #: 3

Attempt or conspire to commit Hobbs Act robbery, in violation of Title 18, United States Code, Section 1951(a)

Title 18, United States Code, Section 951(a)
* **Max. Term of Imprisonment: 20 years**
* **Mandatory Min. Term of Imprisonment (if applicable): n/a**
* **Max. Supervised Release: 3 years**
* **Max. Fine: $250,000**
* **Special Assessment: $100 upon conviction**

Count #: 4

Possession of a firearm in furtherance of a drug trafficking crime (Aiding and Abetting)

Title 18, United States Code, Section 924(c) and 2
* **Max. Term of Imprisonment: Life**
* **Mandatory Min. Term of Imprisonment (if applicable): 5 years**
* **Max. Supervised Release: 5 years**
* **Max. Fine: up to $250,000**
* **Special Assessment: $100 upon conviction**

**\*Refers only to possible term of incarceration, supervised release and fines.   It does not include restitution, special assessments, parole terms, or forfeitures that may be applicable.**

**UNITED STATES DISTRICT COURT
SOUTHERN DISTRICT OF FLORIDA**

PENALTY SHEET

**Defendant's Name**: Liosbel Guillermo Ferrer Ortiz

**Case No**: _____

Count #: 2

Conspiracy to possess with intent to distribute over 5 kilograms of cocaine, in violation of Title 21, United States Code, Section 841(a)(1), (b)(1)(A)(ii) and 846

Title 21, United States Code, Section 841(a)(1) and 846
* **Max. Term of Imprisonment: Life**
* **Mandatory Min. Term of Imprisonment (if applicable): 10 years**
* **Max. Supervised Release: Life**
* **Max. Fine: $10,000,000**
* **Special Assessment: $100 upon conviction**

Count #: 3

Attempt or conspire to commit Hobbs Act robbery, in violation of Title 18, United States Code, Section 1951(a)

Title 18, United States Code, Section 951(a)
* **Max. Term of Imprisonment: 20 years**
* **Mandatory Min. Term of Imprisonment (if applicable): n/a**
* **Max. Supervised Release: 3 years**
* **Max. Fine: $250,000**
* **Special Assessment: $100 upon conviction**

Count #: 4

Possession of a firearm in furtherance of a drug trafficking crime (Aiding and Abetting)

Title 18, United States Code, Section 924(c) and 2
* **Max. Term of Imprisonment: Life**
* **Mandatory Min. Term of Imprisonment (if applicable): 5 years**
* **Max. Supervised Release: 5 years**
* **Max. Fine: up to $250,000**
* **Special Assessment: $100 upon conviction**

**\*Refers only to possible term of incarceration, supervised release and fines.   It does not include restitution, special assessments, parole terms, or forfeitures that may be applicable.**

**UNITED STATES DISTRICT COURT
SOUTHERN DISTRICT OF FLORIDA**

PENALTY SHEET

**Defendant's Name:**   SAGON MICKALETOE STEWARD

**Case No:**

Count #: 2

Conspiracy to possess with intent to distribute over 5 kilograms of cocaine, in violation of Title 21, United States Code, Section 841(a)(1), (b)(1)(A)(ii) and 846

Title 21, United States Code, Section 841(a)(1) and 846
* **Max. Term of Imprisonment: Life**
* **Mandatory Min. Term of Imprisonment (if applicable): 10 years**
* **Max. Supervised Release: Life**
* **Max. Fine: $10,000,000**
* **Special Assessment: $100 upon conviction**

Count #: 3

Attempt or conspire to commit Hobbs Act robbery, in violation of Title 18, United States Code, Section 1951(a)

Title 18, United States Code, Section 951(a)
* **Max. Term of Imprisonment: 20 years**
* **Mandatory Min. Term of Imprisonment (if applicable): n/a**
* **Max. Supervised Release: 3 years**
* **Max. Fine: $250,000**
* **Special Assessment: $100 upon conviction**

Count #: 4

Possession of a firearm in furtherance of a drug trafficking crime (Aiding and Abetting)

Title 18, United States Code, Section 924(c) and 2
* **Max. Term of Imprisonment: Life**
* **Mandatory Min. Term of Imprisonment (if applicable): 5 years**
* **Max. Supervised Release: 5 years**
* **Max. Fine: up to $250,000**
* **Special Assessment: $100 upon conviction**

**\*Refers only to possible term of incarceration, supervised release and fines.  It does not include restitution, special assessments, parole terms, or forfeitures that may be applicable.**

